DONALD E. BOYD,

         Petitioner,

v.

STEVEN JOHNSON, et al.,

         Respondents.

Civil Action No. 18-965 (SDW)

OPINION

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Donald E. Boyd ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court conviction. (ECF No. 1). Respondents filed an answer to the petition (ECF No. 7), to which Petitioner replied. (ECF No. 18). For the following reasons, the Court will deny the petition and no certificate of appealability shall issue.

## I. BACKGROUND

In affirming the denial of post-conviction relief, the Superior Court of New Jersey – Appellate Division provided the following summary of the facts underlying this matter:

> On March 9, 2002, [Petitioner] gained entry into the victim's apartment under the guise of being her former boyfriend, in whose company [Petitioner] had spent the prior evening. The victim, who was ill, buzzed [Petitioner] into her apartment, assuming she had just admitted [her] former boyfriend into the building so he could retrieve some belongings from the home. The victim immediately returned to bed. She was [then] assaulted from behind. The victim never saw her assailant's face, but said he was white, dressed in a blue sweatshirt, and wore surgical gloves.

The initial assault resulted in a spiral fracture of the victim's upper arm. [Petitioner] pulled a pillow case over the victim's head and secured it with a rope or wire, threatened her with a knife and gun, and told her that he was "never going back to prison." After vaginally and anally raping her, [Petitioner] forced her into the shower, directed her to wash, and left. The victim remained in the shower until she was certain her assailant was gone. She then ran into the hallway of her apartment building, pounding on neighbors' doors, screaming that she had been raped.

When police arrived, they found the victim with the pillow case still around her head, string or lace around one leg, and a telephone cord wrapped around her broken arm. She was taken to a nearby hospital for treatment of her injuries.

The victim's former boyfriend testified at trial that he had spent the evening before the assault drinking with [Petitioner] and another person. The following morning, when he awakened, the former boyfriend realized [Petitioner] had taken his truck keys and left. When [Petitioner] returned, he was "sweaty, very nervous, agitated, and couldn't sit still." Soon after he returned, the police called to inform the boyfriend of the assault. [Petitioner] promptly left without a word.

[Petitioner] was not identified as the perpetrator until approximately a year and a half later, when his DNA was found to match the perpetrator's.

. . . .

Approximately a month before the trial was scheduled to begin, [Petitioner] sought to discharge his attorney and represent himself. After a lengthy . . . hearing [on the issue], the court permitted [Petitioner] to do so, but designated his former defense attorney to serve as standby counsel. During the hearing, [Petitioner] denied ever receiving treatment for a mental health disorder, and asserted that his only physical ailments were high blood pressure and arthritis. He was then forty-two years old, had obtained a GED, and claimed to have spent months while incarcerated preparing for the trial. [Petitioner] asked the court to order that he be allowed extra time in the law library, which request the judge granted. [Petitioner] assured the court he had spent many hours training in criminal law, and said he had "been doing this for years. He owned a few Gann law books, including the Criminal Code.

Pre-trial, [Petitioner] consented to have standby counsel conduct jury selection. The judge also ruled, over [Petitioner]'s objection, that he could not directly cross-examine [the victim], rather, that he had to use standby counsel as a "conduit" for his questions.

On the second day of trial, [Petitioner] requested that standby counsel take over the representation. The judge declined the request.

. . . .

Towards the end of the [self-representation] hearing, the trial judge warned [Petitioner] that if he represented himself, he would not be able to raise ineffective assistance of counsel as a basis for [post-conviction relief].

. . . .

[Petitioner] had [previously] been convicted of, among other offenses, a violent rape against a sixteen[-]year[-]old in 1985 and was linked by DNA evidence to a rape in Arizona. [An] Avenel report described [Petitioner] as "a psychopathic individual who merges his barely masked rage and distorted drive for sexual release into violent and sadistic assaults against women[,]" and who has "a complete lack of remorse or even acknowledgement of culpability.

This conclusion was reached by the Avenel psychologist at least in part because when [Petitioner], who entirely denied any culpability, was asked about the DNA evidence, he responded that "[j]ust because there was DNA doesn't mean I raped anyone[,]" implying that he and the victim had consensual sex. When asked further question[s] about the victim's spiral fracture, he responded that he had seen the photographs of [her] arm and it did not look broken to him.

The first day of his closing argument at trial, [Petitioner] superficially cut his arm with a sharp object he had hidden in his mouth. [Petitioner] told the Avenel psychologist that it was "planned, maybe to hurt myself, [or] maybe to get a mistrial." [Petitioner]'s prior criminal history included twenty-seven arrests, seven prior convictions, pending charges in New York, and the possible rape charge in Arizona.

[Petitioner] was represented by a public defender at his sentence hearing, a different attorney than the one who acted as

standby counsel. At [Petitioner]'s behest, that attorney requested his medical records from the Bergen County jail. She was provided with a summary of the medications he was administered while there. The summary [indicated that Petitioner had been treated with Xanax], but, in contrast to the summary, [Petitioner's] complete records revealed that the Xanax was prescribed telephonically by the facility's physician. The physician never met with [Petitioner]. He prescribed the tranquilizer upon being advised of [Petitioner]'s allegedly combative conduct upon arrival at the jail. Neither the records nor the summary included any written consent or acknowledgement by [Petitioner] that he was being given Xanax.[1]

. . . .

As [Petitioner]'s trial was about to begin, he claimed he had been in an altercation with prison staff the night before, had not slept for thirty hours, and had not been provided his regular medication.

The trial judge noted that in our opinion in [Petitioner]'s prior appeal [of a different conviction], the record indicated that as trial was about to begin, [Petitioner] had similarly requested an adjournment because "he had been involved in an altercation in jail the night before, as a result of which he had sustained 'severe abrasions' and a 'nearly closed' right eye. He also claimed he had not received his blood pressure medication and had not slept or eaten in thirty hours."

[Petitioner]'s defense strategy included interruptions to the smooth progress of the trial, accomplished both by his legal arguments and objections, and his conduct. For example, [Petitioner] raised his middle finger at the victim's former boyfriend when he began to testify, requiring the judge to call a recess to address [Petitioner]'s conduct, in the courtroom but outside the presence of the jury.

[Petitioner] appeared to have a plan of action for how he would proceed. For example, he attempted to admit into evidence the police report prepared by the first officer at the scene in order to demonstrate inconsistencies with the victim's description of the event at trial. In support of his application, [Petitioner] argued the excited utterance exception to the hearsay rule.

---

[1] The factual details of Petitioner's being provided and imbibing of the Xanax without challenging or seeking the cessation of the medication are discussed in detail below in the relevant section of this Court's opinion.

When cross-examining a detective testifying for the State, the judge admonished [Petitioner] that it was improper to refer to "alleged" restraint marks on the victim's ankles and wrists. [Petitioner] promptly corrected himself and thereafter only employed the phrase the "alleged victim."

[Petitioner]'s relationship with standby counsel was fraught. At times, he was adamant that he wanted counsel to represent him, and at other times, he claimed counsel had betrayed him and sabotaged his defense by making promises of assistance which did not materialize.

Returning to the cutting incident and its immediate aftermath . . .

Defendant started his summation with the words, "My name is Donald Boyd. You want to see a man bleed?," and proceeded to cut one of his arms with a sharp object he had concealed in his mouth. Sheriff's officers immediately took the blade away from [Petitioner], and the judge and jury left the courtroom. After the incident, while standby counsel, the judge, and the prosecutor were meeting in chambers, standby counsel was directed to leave by her supervisor, and did not return for the summations. Another attorney from the Office of the Public Defender represented [Petitioner] at sentencing.

. . . .

The next day, [Petitioner] finished his closing statement. During a colloquy with the judge outside the presence of the jury, including the judge's repetition of the explanation of the limited role of standby counsel, [Petitioner] said "I don't mean to say this prejudicially, but this is one of the . . . richest, whitest communities in the United States of America, and you're going to give me a black attorney to represent me? I ain't going that route."

Among other things [Petitioner] told the jury in closing: "I had multiple problems with medication at that time, okay. Like I said I was not going to trial with an attorney that said I was guilty."

[Petitioner] also told the jury that the cell phone records that he had attempted to move into evidence, that were in the name of another person, were actually his own records because he had borrowed the other person's phone. The time frame of the loan included the date of the assault. Since the records showed calls made while the assault was taking place, he argued that "I couldn't

have been in three places at once according to those records and I could not introduce them to you." [Petitioner] made this argument despite the fact he did not testify.

The medical expert whom [Petitioner] called as his witness was arranged by standby counsel at [Petitioner]'s request. The expert testified in his behalf that spiral fractures such as the one sustained by the victim can result from accidents, like a fall in a bathtub.

. . . .

From the second day [Petitioner] was housed at the Bergen County Jail, [Petitioner] was given Xanax as well as his regular blood pressure, stomach, and pain medicine. After his conviction, [Petitioner] sued the Bergen County Jail and [its] medical staff in federal court for medical malpractice.[] According to counsel at oral argument on appeal, [Petitioner] recovered $100,000 by way of settlement.

Dr. Kenneth Weiss acted as [Petitioner]'s expert in the federal [civil matter]. Dr. Weiss opined that . . . medical negligence was established by the [jail] doctor's failure to meet with his patient before prescribing medication, and the failure to obtain his informed consent. Dr. Weiss also opined that "the non-consensual administration of Xanax, a drug with known cognition-impairing properties, would likely have impaired [Petitioner's] capacity to act as his own counsel." Presumably, this was mentioned in the report because it was argued as an element of damages.

(Document 11 attached to ECF No. 7 at 4-13, internal citations and quotations omitted).

Following trial, Petitioner was convicted of first-degree aggravated assault, second-degree aggravated assault, first-degree aggravated sexual assault during a kidnapping, first-degree kidnapping, first-degree aggravated assault during a burglary, second-degree burglary, first-degree aggravated sexual assault during a robbery, first-degree robbery, first degree aggravated sexual assault while armed with a knife, and third-degree terroristic threats. (*Id.* at 2-3). Petitioner was ultimately sentenced as a persistent offender to life imprisonment on the first-degree aggravated sexual assault, and a consecutive thirty years on the first-degree kidnapping charge, ten years

consecutive to both the kidnapping and aggravated sexual assault on the burglary charge, and an additional consecutive twenty-year sentence on the robbery charge, for a total sentence of life followed by sixty years. (*Id.* at 3). This sentence was made consecutive for a sentence Petitioner was already serving at the time of his trial and concurrent to a sentence on an additional sentence on an unrelated charge imposed on the same day. (*Id.*). Petitioner appealed, and his conviction was affirmed, but his sentence remanded. (*Id.* at 3-4). Petitioner was resentenced to the same sentence on remand, again appealed, and his resentencing was upheld. (*Id.*).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## B. Analysis

### 1. Petitioner's forced medication claim

In his chief claim, Petitioner contends that he was denied Due Process when he was medicated with Xanax during trial without his consent. In making this claim, Petitioner relies upon the Supreme Court's decision in *Riggins v. Nevada*, 504 U.S. 127 (1992). In *Riggins*, the Court was faced with a situation where a petitioner, whose only defense to a murder charge was an insanity defense, was subjected to the "forced administration of Mellaril," a powerful antipsychotic drug, at a very high dose. *Id.* at 129-33. As the Court noted, there was no dispute in *Riggins* that the administration of the medication was "involuntary" and "unwanted," that Riggins had specifically sought a court order terminating administration of the drug, and that the application of Mellaril "denied [Riggins] an opportunity to show jurors his true mental condition."

*Id.* at 133. Based on these background facts, the Court determined that "once Riggins moved to terminate administration of antipsychotic medication" the Due Process Clause required the state "to establish the need for Mellaril and the medical appropriateness of the drug" by showing either that administration of the drug was "essential for the sake of Riggins' own safety or the safety of others" or that "involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means." *Id.* at 135-36. The Court did not expressly find that no showing of prejudice was necessary in involuntary medication cases. Instead the Court observed that "trial prejudice can sometimes be justified by an essential state interest," but that the failure of the State to show in Riggins' case that there was an essential state interest which required the involuntary administration of Mellaril combined with the "substantial probability of trial prejudice" under the circumstances – Riggins' attempt to show his insanity while being heavily medicated and the inability to establish the exact changes to his behavior after the fact – required the reversal of Riggins' conviction. *Id.* at 137-38.

Petitioner argues that the state courts in this matter acted contrary to or unreasonably applied *Riggins* in denying him relief based on his having been given Xanax during and before trial without an affirmative expression of consent from him. In rejecting this claim in their opinion affirming the denial of post-conviction relief, the Appellate Division noted that Petitioner was given medication only after complaining about shaking and not being given his normal medications, that a jail nurse announced in open court and in the presence of Petitioner (but out of the jury's presence) that she was providing Petitioner with "Xanax, one milligram" in addition to his other medications, that Petitioner after being medicated specifically said he was thinking and feeling more "level headed and . . . clear," and that Petitioner did not complain about the administration of Xanax until shortly before summations when he claimed he had only learned the

night before that he was being given one milligram of Xanax. (Document 11 attached to ECF No. 7 at 13-15). The Court also noted that the trial judge "responded immediately to defendant's concerns regarding his medications" when he first complained shortly before summations, and that even when he complained about the Xanax, Petitioner "did not request the drug be stopped."[2] (*Id.* at 19).

Based on these facts, the Appellate Division concluded that Petitioner's case was entirely distinguishable from *Riggins* because Petitioner's willing ingestion of Xanax, after the name and dosage of the drug were announced in his presence in open court, indicated that the administration of the drug was not forced or involuntary. (*Id.* at 19). The Appellate Division found further support for this determination in noting that Petitioner had vociferously complained about the failure of the jail to medicate him and about his various other disagreements with his originally appointed counsel, and that Petitioner's silence combined with his voluntary ingestion of the drug thus refuted any claim that Petitioner was unaware of what he was taking and was opposed to the Xanax in any event. (*Id.* at 20).

As the Appellate Division determined that the administration of Xanax was not involuntary, the Appellate Division in turn found that no per se constitutional violation had occurred, and that Petitioner had failed to otherwise show that he was prejudiced by the administration of the drug based on the following:

---

[2] Prior to summation, Petitioner stated that the State had "been giving [him] Xanax for the last five days in a row. . . . It's an antidepressant medication. I've never taken it in my life and I come here . . . and you're going to start giving me Xanax, at the highest dosage." (Document 1 attached to ECF No. 1 at 626). Petitioner also stated that he doesn't "take drugs." (*Id.*). Petitioner did not, however, request that the Xanax be stopped, that he not be required to take the drug, or an order of the Court directing the jail to cease providing Xanax or alter the dose. The record is thus absent of any request by Petitioner to stop or otherwise alter the administration of Xanax, even after he indisputably was aware that he was being given the drug, was aware of the nature of the drug, and was aware of the high dosage he asserts he was being given.

our review of the transcripts [does not] support the claim that [Petitioner] was in some fashion intoxicated or cognitively impaired, as a result of the Xanax. This is [Petitioner's] second point on the issue, and he supports the claim by stating he was being given the drug twice a day in large amounts. We reiterate that on the record when [Petitioner] spoke to the trial judge regarding his mental status, it was only to point out how much better he felt once his regular medication was resumed. At that juncture, he had been taking the Xanax for approximately two days.

[Petitioner]'s responses to legal issues during the trial, although those of a layperson, not versed in the law, were not at all confused. Based on our review of the transcripts, [Petitioner]'s course of conduct during the trial was consistent with his course of conduct during his un-medicated pre-trial court appearances including [during pre-trial] hearing[s].

Even [Petitioner]'s highly unusual strategy in cutting himself in front of the jury he later acknowledged was a tactic employed to trigger a mistrial. The admission was made to the evaluator at Avenel, months after the trial, months after he stopped being given Xanax. [Petitioner]'s decision to represent himself in the face of first-degree charges with the potential for sentencing as a persistent offender was itself atypical. And that crucial choice, and the . . . hearing [on it] that followed, occurred weeks before [Petitioner] was given Xanax.

We therefore find that the administration of the drug was not a per se violation of [Petitioner]'s constitutional rights that would warrant a new trial. Nor was it a circumstance that impaired [Petitioner]'s ability to function as his own attorney such as would entitle him to a new trial.

We do not mean by this decision to condone in any way the conduct of the jail staff. However, after close examination of the trial record, we conclude that to the extent any harm was visited upon [Petitioner] by the administration of Xanax, that harm does not undermine our confidence in the fairness of the process.

Throughout, [Petitioner] has blamed his attorneys, the State, and the judge for what he described as the "rigged" outcome [of his trial]. That the outcome was preordained was the result of proof that, unfortunately for him, could not have led a reasonable jury to any other result. There is a significant difference between a "rigged" outcome and one produced by the weight of overwhelming evidence.

(*Id.* at 20-21).

This Court having extensively reviewed and considered the record in this matter, it is clear that the Appellate Division's determination of the facts recounted above was not unreasonable. Likewise this Court finds that Petitioner has failed to show that those factual conclusions, including his having ingested the Xanax after he was told what he was being given in open court and his failure to ever request the medication be stopped, were incorrect by clear and convincing evidence[3], and this Court is therefore required to presume that those factual findings are correct. 28 U.S.C. § 2254(e)(1). Because the factual findings of the Appellate Division are not unreasonable and are presumed to be correct, the question presented to this Court is whether the Appellate Division unreasonably applied Supreme Court caselaw in concluding that *Riggins* did not mandate relief where the Petitioner did not oppose or object to the medication he was given (i.e. where the medicating of the Petitioner was essentially voluntary).

Numerous courts, including some circuit courts, have distinguished Riggins along the same lines as the state courts in this matter – by finding that the extreme relief of a new trial is not automatically warranted without a showing of prejudice where the medication in question was ingested voluntarily or without objection. *See, e.g., Benson v. Terhune*, 304 F.3d 874 (9th Cir.

---

[3] Petitioner argues in his briefs that there is "no evidence" that Petitioner was aware that he was being given Xanax following the identification of the medicine in his presence in open court by the nurse who administered the drug to him. Petitioner essentially asserts that he either wasn't paying attention at the time or did not hear the name of the medication when announced by the nurse. Petitioner does not dispute, however, that he was in the court room at the time, and that the nurse made the announcement while speaking with the trial judge in Petitioner's presence. Petitioner has also failed to show that he ever requested the medication be stopped even after he was clearly aware of the nature of the drug and dosage he was being given. Petitioner's self-serving assertion that he may not have heard what the nurse said is by no means "clear and convincing" evidence that he was unaware of what he was given, and thus is insufficient to overcome the presumption that the state courts' factual conclusion that he heard this statement and was aware of the medication he was given is correct. 28 U.S.C. § 2254(e)(1).

2002); *Basso v. Thaler*, 359 F. App'x 504, 507-08 (5th Cir. 2010); *Anger v. Klee*, No. 14-14159, 2015 WL 6437224, at *11 (E.D. Mich. Oct. 21, 2015); *Tiran v. Lafler*, No. 09-14807, 2011 WL 2518922, at *10 (E.D. Mich. June 23, 2011); *Powell v. Kelly*, 531 F. Supp. 2d 695, 728-29 (E.D. Va. 2008), *aff'd*, 562 F.3d 656 (4th Cir. 2009), *cert. denied*, 559 U.S. 904 (2010); *Commonwealth V. Baumhammers*, 92 A.3d 708, 733 (Pa. 2014). Indeed, the Supreme Court has itself reiterated that the *Riggins* framework applies only where the medication of the criminal defendant was *forced* and *involuntary*. *Sells v. United States*, 539 U.S. 166, 178-81 (2003). Where an individual voluntarily ingests the medication without objection, it follows that *Riggins* and its assumption of prejudice simply do not apply. *Basso*, 359 F. App'x at 508 ("there is no authority holding that voluntary administration of medication violates [a petitioner's] right to due process"). Likewise, although *Benson* may have required a level of informed consent similar to that required to waive a petitioner's *Miranda* rights, Petitioner has identified no Supreme Court caselaw requiring that a criminal defendant expressly indicate his informed consent to the medication he was being given in the absence of an objection to his continued treatment with the medication. Petitioner thus cannot show that the state courts were unreasonable merely by asserting that no hearing was held on the issue of informed consent in the absence of an objection from Petitioner to his continued medication as there is no such requirement present in the clearly established decisions of the United States Supreme Court.[4]

---

[4] Petitioner's reliance on *White v. Napolean*, 897 F.2d 103, 113 (3d Cir. 1990), a case dealing with a § 1983 claim for damages brought against a prison doctor is misplaced. *White* concerned whether convicted prisoners had a right to refuse treatment and in turn to be informed about the proposed course of treatment in determining whether to refuse treatment. *Id.* *White* likewise concerned whether a doctor who allegedly violated this right to information could be held *civilly liable* for his failings, and did not address any requirement that a *criminal court* go beyond its own record to ensure that a criminal defendant had informedly consented to all of the medications which he had been provided in the absence of an objection to his continued medication. *Id.* Petitioner has failed to identify any clearly established Supreme Court caselaw imposing such a requirement on

Based on the well supported factual conclusions of the state courts, to which this Court owes considerable deference and a presumption of correctness, Petitioner voluntarily consumed Xanax, and never requested that his Xanax administration be stopped. As Petitioner's ingestion of Xanax was neither forced over his objection nor involuntary based on the well-supported factual determinations of the Appellate Division, the Appellate Division's conclusion that Petitioner was not entitled to a new trial without a showing of prejudice does not amount to an unreasonable application of the Supreme Court's decision in *Riggins*. As the Appellate Division's rejection of Petitioner's claim that he was involuntarily medicated was neither contrary to nor an unreasonable application of *Riggins* or any other identified Supreme Court precedent, Petitioner is not entitled to habeas relief on that basis. *Basso*, 359 F. App'x at 508.

Petitioner also takes issue with the Appellate Division's conclusion that Petitioner was not prejudiced by his having been medicated with Xanax during trial, arguing that *Riggins* specifically precluded use of an actual prejudice standard in forced medication cases. Petitioner is correct, but only to the extent that *Riggins* does not require a showing of actual prejudice in cases involving the *forced* or *involuntary* medicating of a criminal defendant with powerful psychotropic drugs. 504 U.S. at 137 (finding that a showing of prejudice was not required in cases involving the *forced* medication cases as "the precise consequences of forcing antipsychotic medication upon [a defendant] cannot be shown from a trial transcript"). As Petitioner was not subject to forced medication based on the well supported factual determinations of the state courts, that holding of *Riggins* is inapplicable to Petitioner's case, and thus the requirement of prejudice placed upon

---

criminal courts in general or for criminal courts dealing with a *pro se* defendant specifically, and the state courts thus could not have unreasonably applied Supreme Court caselaw by not imposing such a requirement in cases in which no objection to continued medication has been raised.

14

Petitioner by the Appellate Division was neither contrary to nor an unreasonable application of *Riggins*. Petitioner is therefore not entitled to habeas relief on that basis.

In his final Xanax related claim, Petitioner contends that his being given Xanax deprived him of his right to counsel insomuch as it retroactively rendered his decision to represent himself uninformed. While the Constitution "does not force a lawyer upon a [criminal] defendant, it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004) (internal quotations and citations omitted). A waiver meets this standard when the criminal defendant "knows what he is doing and his choice is made with eyes open," which requires he possess sufficient information which "will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to [sic] choose self-representation, he should be made aware of the dangers and disadvantages of self-representation so that the record will establish that he knows what he is doing." *Id.* at 89 (quoting *Faretta v. California*, 422 U.S. 806, 835 (1975)). Because counsel at trial "is required to help even the most gifted layman adhere to the rules of procedure and evidence, comprehend the subtleties of *voir dire*, examine and cross-examine witnesses effectively . . . , object to improper prosecution questions, and much more . . . [w]arnings of the pitfalls of proceeding to trial without counsel . . . must be rigorous[ly] conveyed." *Id.* In order to warrant habeas relief, a petitioner asserting that he was improperly allowed to proceed pro se must "convince[] the court by a preponderance of the evidence that he neither had counsel nor properly waived his constitutional right to counsel." *Pazden v. Maurer*, 424 F.3d 303, 313 (3d Cir. 2005) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 469 (1938)).

As the Appellate Division explained on direct appeal, the trial judge in this matter conducted a hearing on Petitioner's decision to waive his right to counsel. At that hearing, the trial court explained to Petitioner forcefully that it was unwise of him to proceed *pro se* in light of his lack of legal knowledge and experience, as well as the difficulty of playing the dual roles of defendant and defense counsel. (*See* Document 3 attached to ECF No. 7 at 12-14). Petitioner was warned of the extremely limited role of standby counsel, informed Petitioner that he would not be able to withdraw his waiver easily once made, and made certain Petitioner understood that he was foregoing the ability to raise ineffective assistance of counsel claims by choosing to proceed *pro se*. (*Id.* at 14-16). The trial court also explained to Petitioner the impact self-representation would have upon both his ability to discern whether he should testify on his own behalf and his ability to remain silent if he so chose in light of his engaging in questioning of fact witnesses. (*Id.* at 16). In spite of all these warnings, Petitioner was adamant that he proceed *pro se*, insisted he understood the charges and how he was going to defend himself, and expressed his belief that he would be acquitted following his self-representation. Based on this hearing, the state courts determined that Petitioner made a knowing, voluntary, and intelligent waiver of his right to counsel.

Having reviewed the record, this Court finds these determinations well supported, and finds Petitioner's contention that his being given Xanax without objection to his continued medication somehow undid his knowing and voluntary waiver of his right to counsel which was made before Xanax was prescribed by jail house doctors without merit. Although Petitioner contends that his being permitted to continue to waive his right to counsel following his being given Xanax without an objection or request to cease medication was improper because he had not been given information about this medication at his pre-trial hearing for obvious reasons, Petitioner has provided nothing but after the fact speculation to suggest that Petitioner's ability to understand the

pitfalls of self-representation was hindered or harmed by his being given Xanax after having made that decision. Petitioner has presented no caselaw to support the assertion that the Court is required to presage the actions of jail house doctors or readdress Petitioner's waiver to counsel following a change in his medication to which the Petitioner does not actively object. Given Petitioner's clear decision to proceed *pro se* following extensive warnings from the trial court, and given the lack of any controlling caselaw which supports Petitioner's contention that the Court had to reevaluate his waiver in the absence of his being involuntarily medicated, Petitioner has failed to convince this Court that he proceeded to trial without having knowingly, voluntarily, and intelligently waiving his right to counsel, and has likewise failed to show that the state courts' decisions were contrary to or unreasonable applications of federal law. Petitioner has thus failed to show his entitlement to habeas relief on any of his Xanax related claims.

### 2. Petitioner's confrontation clause and self-representation claim

Petitioner next contends that he was denied his right to confront the witnesses against him where he was required to cross-examine the victim in this matter through the "conduit" of standby counsel. The right of an accused individual "to be confronted with the witnesses against him" under the Sixth Amendment "includes the right to conduct reasonable cross-examination." *Wright v. Vaughn*, 473 F.3d 85, 93-94 (3d Cir. 2006) (internal quotations omitted). A criminal defendant can therefore establish a violation of his rights under the Confrontation Clause "by showing that he was prohibited from engaging in otherwise appropriate cross-examination" which would "expose the jury [to facts] from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). A criminal defendant's rights under the clause are not

unlimited, however; a criminal defendant's cross-examination of a witness is still subject to the discretion of trial judges to curtail improper questioning and to limit repetitive and otherwise irrelevant testimony on cross-examination. *Wright*, 473 F.3d at 93. Likewise, alleged violations of the Confrontation Clause based on the curtailment of cross-examination are subject to harmless error analysis. *Id.* (citing *Van Arsdall*, 475 U.S. at 684). On collateral review, even errors of a constitutional dimension will be considered harmless and thus not a basis for habeas relief "unless [the alleged constitutional error] had a substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Piller*, 551 U.S. 112, 116 (2007); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

Petitioner asserts that the decision to force standby counsel to question the victim over his objection not only infringed his confrontation clause rights, but also impugned his right to self-representation. As the Supreme Court has explained,

> In determining whether a [petitioner's right to self-representation has] been respected, the primary focus must be on whether the [petitioner] had a fair chance to present his case in his own way. . . .
>
> . . . [T]he right to speak for oneself entails more than the opportunity to add one's voice to a cacophony of others. [Thus,] the objectives underlying the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive participation by standby counsel. In proceedings before a jury, the [petitioner] may legitimately be concerned that multiple voices "for the defense" will confuse the message the [petitioner] wishes to convey, thus defeating [the purposes of the petitioner's right to represent himself. Accordingly, [the right to self-representation] must impose some limits on the extent of standby counsel's unsolicited participation.
>
> First, the *pro se* [Petitioner] is entitled to preserve actual control over the case he chooses to present to the jury . . . [which] is the core of [a petitioner's] right [to self-representation]. If standby counsel's participation over the [petitioner's] objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of

> witnesses, or to speak instead of the defendant on any matter, the [self-representation] right is eroded.
>
> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the [petitioner] is representing himself. The [petitioner's] appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy.

*McKaskle v. Wiggins*, 465 U.S. 168, 177-78 (1984) (internal footnotes omitted); *see also Buhl v. Cooksey*, 233 F.3d 783, 802 (3d Cir. 2000). "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the [petitioner], its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless." *Buhl*, 233 F.3d at 806 (quoting *McKaskle*, 465 U.S. at 177 n. 8). Because there is no absolute bar on standby counsel's unsolicited participation, however, that standby counsel took part in portions of a petitioner's trial does not amount to a *per se* denial of the right to self-representation. *McKaskle*, 465 U.S. at 176-79.

In affirming Petitioner's conviction on direct appeal, the Appellate Division provided the following summary in support of its conclusion that counsel's acting as a "conduit" for Petitioner to cross-examine the victim at trial:

> [Petitioner] objects to [standby counsel] acting as a "conduit" for [Petitioner's] cross-examination of the victim. [Petitioner] was offered the choice of communicating his questions to standby counsel through headphones, or of sitting next to standby counsel and providing her directly with the questions he wanted to pose to the victim. [Petitioner] chose to have standby counsel sit next to him, and [Petitioner] wrote many pages of questions, all of which standby counsel asked. The judge ordered the procedure because he considered it "unreasonable" to expose the victim to the psychological impact of direct examination by a man which DNA evidence establishes [to have been her] rapist. This procedure should not ordinarily be employed in the absence of a hearing. Although in substance, [Petitioner] continued to exercise total

control of his defense, no record was developed to establish a particularized need for this victim to be questioned in this manner.

[The Appellate Division then properly identified the *McKaskle* standard and its state law progeny as the controlling legal principles.]

[Petitioner] was able [through standby counsel] to ask every question that he wanted. Because of the unique process, it would be clear that [Petitioner] continued to represent himself, and that he and he alone[] controlled the cross-examination.

The jury would have observed [Petitioner]'s extensive notes as the cross-examination was proceeding, and the fact that standby counsel was asking questions given to her by [Petitioner]. [Petitioner] was not permitted to "confront" his accuser only in the most literal meaning of the term. The right of confrontation does not mean the right to face-to-face confrontation; rather it means a party must have a meaningful opportunity, through the legal process, to cross-examine witnesses.

. . . .

Even if this cross-examination procedure was, as [Petitioner] contends, constitutional error [insomuch as it allegedly violated his Confrontation Clause rights], we believe it was harmless beyond a reasonable doubt. . . . Given the strength of the [State's] proofs, this cross-examination procedure raises no such doubt.

(Document 3 attached to ECF No. 7 at 25-29). The Appellate Division thus found that Petitioner's right to self-representation had not been denied because it was clear that Petitioner continued to control both the cross-examination of the victim and his own case, and that to the extent one could argue there was a Confrontation Clause violation, it was utterly harmless. (*Id.*).

Having reviewed the record of this matter, this Court concludes that the above quoted decisions of the Appellate Division are neither contrary to nor unreasonable applications of controlling Supreme Court caselaw. Turning first to the self-representation issue, the Appellate Division identified and applied *McKaskle* reasonably and found that requiring Petitioner to ask his questions for the victim through the conduit of standby counsel neither deprived Petitioner of

control of his own defense nor suggested to the jury that anyone other than Petitioner – including standby counsel – was in control of Petitioner's defense. The Appellate Division thus found that the trial court's requirement, although not ideal, amply respected and did not deny Petitioner's right to self-representation. As the factual findings underpinning this conclusion – including Petitioner's taking and use of notes in providing his questions to counsel and the Court's offer to Petitioner of alternative means to provide counsel with his questions in the form of headphones and a microphone – are well supported in the record, and in light of the deference thus owed those findings, this Court concludes that the Appellate Division did not unreasonably apply *McKaskle* in finding that there was no violation of Petitioner's right to self-representation. Petitioner's claim that he was so denied his self-representation right is thus insufficient to warrant habeas relief.

Turning to Petitioner's claim that he was denied his right to confront the witnesses against him in the form of the victim in this matter, this Court agrees with the Appellate Division that any Confrontation Clause error would have been utterly harmless in light of the substantial DNA evidence of Petitioner's guilt. Although this alone is sufficient to deny Petitioner habeas relief on his confrontation claim, this Court further finds that there was no error in any event. Petitioner was provided ample means to present any and all questions he had for the victim through the conduit of standby counsel, and there is nothing in the record which suggests that Petitioner was denied the ability to pursue any legitimate line of questioning he wished to pursue during the cross-examination of the victim. As Petitioner was not prohibited from engaging in any otherwise proper form of cross-examination, that he was required to ask his questions through the conduit of standby counsel did not violate Petitioner's rights under the Confrontation Clause. *Olden*, 488 U.S. at 231; *Wright*, 473 F.3d at 93-94. Petitioner's Confrontation Clause claim is thus also insufficient to warrant habeas relief.

### 3. Petitioner's Ineffective Assistance of Counsel Claim

Petitioner next argues that the counsel he was assigned for sentencing and his direct appeal counsel were constitutionally ineffective insomuch as they obtained only a summary of his medications rather than his full jail medical history. Essentially, Petitioner contends that had counsel had Petitioner's full medical history, counsel could either have made a more successful motion for a new trial on the *Riggins* basis discussed above or could have presented such an argument on direct appeal. The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate

that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Petitioner argues that his trial and appellate counsel proved ineffective by failing to acquire his full jail medical history, and in so doing prevented his motion for a new trial or appeal from fully presenting the *Riggins* claim discussed above. The Appellate Division rejected these claims, finding that even had Petitioner presented his full medical records, Petitioner failed to show that he would have been entitled to a new trial. (*See* Document 11 attached to ECF No. 7 at 24-25). Specifically, the Appellate Division rejected that *Riggins* provided a basis for a new trial for the reasons discussed above, and to the extent that Petitioner contends that the Xanax unconstitutionally addled his self-defense notwithstanding his failure to show that he had opposed or objected to his continued treatment, Petitioner had failed to present sufficient evidence to show that the medication actually affected his self-defense. (*Id.*). Although Petitioner had presented the Appellate Division with an expert report from his previous federal civil suit, the Appellate Division found this expert opinion largely irrelevant as the expert in question did not note the basis for his

report, was unlikely to have actually reviewed the trial transcript because it was extraneous to the subject of his opinion in the civil case, and because the expert had no ability to retroactively measure or guess what effects the medication had upon Petitioner at trial. (*Id.* at 25-26). Thus, given the lack of evidence showing how Petitioner's self-defense was prejudiced, as well as the fact that Petitioner was extensively warned of the dangers of self-representation, and as Petitioner failed to make out a claim under *Riggins*, the Appellate Division concluded that counsel could not have prevailed on a new trial motion or on direct appeal even with Petitioner's full medical records as there was little if any actual evidence of prejudice and certainly not enough to establish prejudice in light of the overwhelming evidence of Petitioner's guilt presented at trial. (*Id.* at 24-26).

For the reasons expressed above, Petitioner has failed to establish his entitlement to a new trial under *Riggins*, and in turn cannot show that the Appellate Division's rejection of his *Riggins* based ineffective assistance of counsel claim on that basis amounts to an unreasonable application of the *Strickland* standard. Likewise, the Appellate Division's finding that Petitioner failed to show prejudice as to counsel's failure to obtain his full medical records also was neither contrary to nor an unreasonable application of *Strickland*. While Petitioner makes much of the expert reports submitted in his federal civil rights suit – which concerned not his trial but rather whether he had been prescribed Xanax by jailhouse doctors without proper consultation or examination – the Appellate Division correctly notes that these reports provide little more than speculation as to how Petitioner may have been affected in representing himself at his trial by his having ingested the prescribed Xanax, and do not suffice to establish that the outcome of his trial was prejudiced by the medication. As such, Petitioner failed to establish *Strickland* prejudice, and the Appellate Division's rejection of his ineffective assistance of sentencing and appellate counsel claims were

therefore neither contrary to nor an unreasonable application of *Strickland*. Petitioner's ineffective assistance of counsel claims thus provide no basis for habeas relief.

Additionally, Petitioner contends that standby counsel's supervisor, who eventually represented him during his sentencing and his post-trial new trial motion, was also ineffective in ordering standby counsel to leave the court room following Petitioner's cutting of himself during his initial attempt at summation, "leaving" Petitioner to deliver his second summation and to mention to the Court his having been medicated without the presence of standby counsel. The Appellate Division rejected this claim, finding that Petitioner had been repeatedly warned of the dangers of representing himself, including the fact that he waived "any and all later claims that his self-representation constituted ineffective assistance of counsel." (*See* Document 11 attached to ECF No. 7 at 24-25). The Appellate Division thus found that Petitioner was barred from raising any such claim based on his self-representation. (*Id.*). As the Supreme Court explained in *Faretta*, "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" 422 U.S. at 834 n. 46. As the applicable Supreme Court precedent supports the Appellate Division's rejection of Petitioner's claim that his self-representation during summation was inadequate, and as the record of this matter firmly establishes that Petitioner was fairly warned of the dangers of self-representation, including the waiver of ineffective assistance claims, and chose to proceed *pro se* regardless, the Appellate Division's decision was neither contrary to nor an unreasonable application of relevant Supreme Court caselaw, and provides no basis for habeas relief.[5]

---

[5] Although Petitioner's claim provides no basis for habeas relief, this Court joins the Appellate Division in refusing to "condone standby counsel's departure from the courthouse or her supervisor's instruction to do so." (Document 3 attached to ECF No. 7 at 24 n.. 2). That this decision was ill advised, however, is not sufficient to warrant habeas relief in this matter in light of Petitioner's decision to proceed *pro se* after being amply warned against doing so.

### 4. Petitioner's cumulative error claim

In his final argument, Petitioner contends that even if the errors he alleged were insufficient to warrant habeas relief individually, he should in any event still be entitled to a new trial because those alleged errors cumulatively denied him a fair trial. Although errors "that individually do not warrant habeas relief may do so when combined,"

> a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (internal quotations and citations omitted), *cert. denied*, 552 U.S. 1108 (2008). Petitioner's claims in this matter fair no better cumulatively than they do individually. To the extent that Petitioner has presented claims not subject to harmless error analysis, Petitioner has failed to establish a violation sufficient to warrant relief, and in his remaining claims Petitioner has failed to show any error that, either cumulatively or individually, could have had "a substantial and injurious effect" on the outcome of Petitioner's trial given the strong evidence of his guilt. *Id.* Petitioner has therefore failed to show any basis for habeas relief, and his habeas petition is denied.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this

standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner's claims are insufficient to warrant habeas relief and jurists of reason would therefore not disagree with this Court's denial of Petitioner's habeas petition. Petitioner is therefore denied a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus (ECF No. 1) is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

January 24, 2019                    *s/ Susan D. Wigenton*
                                           Hon. Susan D. Wigenton,
                                           United States District Judge